First Church of the Brethren of Lewistown *v.* Snider, Appellant.

Argued November 24, 1950. Before DREW, C. J., STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*James E. Bennet* and *Paul S. Lehman,* for appellants.

*Paul E. Fetterolf* and *Frank E. Hahn, Jr.,* with them *Edmonds, Obermayer & Rebmann,* for appellees.

OPINION BY MR. JUSTICE LADNER, March 19, 1951:

The First Church of the Brethren of Lewistown is a religious corporation, incorporated by decree of the Court of Common Pleas of Mifflin County on May 7,

1917. Unhappy differences having arisen in the congregation, a bill in equity was filed in which it was charged that the pastor, Harold Snider, and those of the congregation supporting him, had departed from the practices and beliefs of the established Church of the Brethren, the highest human authority of the denomination being the General Conference. The bill charged in substance that the defendants instigated by the Pastor Snider, endeavored to set themselves up as an independent congregation and were about to dedicate the church property in the name of the Calvary Independent Church.

The cause came on for trial before President Judge SHEELY, specially presiding, who after a full hearing and careful review of the evidence found in favor of the plaintiffs and entered a decree nisi granting the relief prayed for. Exceptions to the chancellor's findings and decree nisi were subsequently dismissed by him sitting en banc.

We have perused the evidence and conclude the learned court's findings of fact are supported by adequate evidence and therefore can do no better than recite the facts as they are set forth by him in the following extract of the discussion of his adjudication: "The dispute mainly concerns the alleged efforts on the part of the defendants, and particularly the Reverend Harold Snider, their pastor, to disassociate themselves from the general denomination of the Church of the Brethren and to declare themselves sovereignly independent of any authority by the various conferences and committees of the general denomination. As to their efforts in this respect there can be no doubt.

"The Reverend Harold Snider, a duly ordained minister of the Church of the Brethren, became pastor of the First Church of the Brethren of Lewistown on or about January 1, 1941. On May 4, 1942, under his

leadership and direction, the congregation adopted a constitution and by-laws (although they were then operating under a corporate charter) which provided, inter alia, that the congregation should be known as the Church of the Brethren and, in Section 2: 'Though it shall be the purpose of this congregation to work in harmony with all other branches of our own faith and name, and also with all other churches insofar as our doctrine of faith will permit, it shall nevertheless be the object of this group to maintain at all times a strictly independent sovereignty, exercising the right of free choice in all matters, which is in keeping with the historic position of our church, same being strictly congregational in its form of government.' The immediate reason for the adoption of this statement of sovereignty does not appear, but its purpose may be found in the defendants' contention that dissension between the Reverend Mr. Snider and the Elders of the Middle Pennsylvania District began on or shortly after the date when the Reverend Mr. Snider assumed his ministry to the Lewistown congregation. Thereafter, under the leadership of the Reverend Mr. Snider, the hymnbooks used by the congregation were changed and a hymnbook not published by the Church of the Brethren was adopted. Likewise, the Sunday School literature was changed from that prepared by the Church of the Brethren to that published by a non-denominational publishing house. Neither of these acts, of itself, would constitute a departure from the doctrines of the church but, when considered with the other acts of the defendants, they assume importance as showing the real intention of the defendants or, more particularly, of the Reverend Mr. Snider. About 1946 the Church Council officially resolved not to forward money to the General Board of the church at Elgin, although this resolution was not carried out and pay-

ments were thereafter made at the direction of the Finance Committee.

"In 1942 the Reverend Mr. Snider published and distributed a book entitled 'Does the Bible Sanction War' in which he explained why he was not a pacifist and drew a distinction between 'aggressive' war and 'defensive' war, contending that only the former was prescribed by the Bible. He likewise preached and spoke publicly on the same subject. This teaching was contrary to the historic peace doctrine of the church and the statement in the Declaration of Faith that the church 'opposes on scriptural grounds, war and the taking of human life.' Although it is true, as contended by the defendants, that the church did permit freedom of choice by the individual as to whether he should assert his conscientious objections to war when called for service, and that 80% of those called were inducted into service, the General Conference of the church has a Standing Committee known as the Peace Committee whose duty it is to promote in every way possible 'a realization of the wickedness and folly of war, and thus to build up a public conscience which shall demand peaceful methods in settling civil and international differences.'

"The Reverend Mr. Snider also published a paper called 'The Brethren Fundamentalist' in which he expressed his views on doctrinal and church matters. He particularly took issue with the action of the Annual Conference in joining the Federal Council of Churches of Christ in America. Not only did he oppose affiliation with the Federal Council, but in his writings and in his public utterances from the pulpit he attacked the leadership of the church as false, apostate, modernist, corrupt, and unworthy of the support and respect of the members of the congregation. He also delivered personal attacks upon the leaders of the Mid-

dle District of Pennsylvania. Early in 1948 the congregation, overlooking, or perhaps ignorant of, the fact that it had been incorporated in 1917, attempted to incorporate the congregation under the name of 'Calvary Brethren Church of Lewistown, Pennsylvania,' but after objections were made the effort was dropped. There is an important difference between 'The Church of the Brethren' and the 'Brethren Church' as is indicated in the case of Main Street Brethren Church of Myersdale vs. Polman, 14 Somerset 49. While the selection of this name may have been accidental it was, at least, unfortunate. It is, however, significant that the purpose clause of the proposed corporation made no reference to the general Church of the Brethren as did the original charter of 1917.

"As a result of these acts by the Reverend Mr. Snider, the Elders of the Middle District of Pennsylvania appointed a committee to present and hear charges against him, charging him specifically with publishing incorrect statements, opposing the historic peace position of the Church of the Brethren; refusing to hear the church as represented by the Elders of the Middle District and the Standing Committee of Annual Conference; and attempting to incorporate the Lewistown Church of the Brethren in the name of another denomination. Instead of answering the charges or appearing at the hearing at which the truth or falsity of the charges could be established by the church judicatory, the Reverend Mr. Snider wrote a letter dated April 24, 1948, to the Ministerial Board of the Middle District of Pennsylvania resigning his ministry in the Church of the Brethren, stating that the present leadership of the church had indicated the test of loyalty to the church to be contingent on one's willingness to preach pacifism and approve the merger with the modernistic Federal Council of Churches of Christ in

America; that he was not a pacifist and that he was a fundamentalist. In a postscript he stated that he was not resigning his pastorate in the Lewistown church. On May 1, 1948, the Elders of the Middle District of Pennsylvania received a report of the committee and took action declaring that the Rev. Mr. Snider was no longer a minister of the Church of the Brethren and notified him of that action.

"On April 26, 1948, two days after Mr. Snider's letter of resignation, the Church Council of the Lewistown Church adopted a resolution withdrawing the application for articles of incorporation 'and instead we declare ourselves (according to the constitution and by-laws of this congregation adopted May 4, 1942) to be sovereignly independent, and will recognize no authority outside of this local congregation.' It was further resolved that 'we declare our name to be from this day hence The Calvary (Independent) Church of the Brethren' to worship God according to the Holy Bible and as clearly set forth in the doctrinal statement of the constitution as contained in Article III, and that we practice the 'distinctive Brethren doctrines and teachings as set forth in the statement of faith which is published *by the church entitled "The Church of the Brethren"* . . . insofar as they are formed in agreement with God's Word.' On May 2, 1948, the constitution was amended to change the name of the church to 'Calvary Independent Church of the Brethren' and Article II, Section 2 was amended to read: 'As a sovereign independent congregation so determined by the Church Council of May 4, 1942, we now further state we will recognize no authority outside of this local congregation.' The amendment clause was also amended to provide that the constitution could not be set aside except with the unanimous consent of all Council members present. The declaration of inde-

pendence was thus made practically irrevocable.

"On May 16, 1948, the Church Council again met and took action that 'those individuals who hold any office in the Church of the Brethren, District, otherwise outside our local congregation shall disassociate themselves from any attachment and shall declare themselves disassociated from such District office.' On June 11, 1948, the secretary of the official Church Board wrote the Moderator of the Annual Conference stating that they assumed he was fully informed regarding 'the disgraceful action of the Middle Pennsylvania Elders body vs. the Lewistown congregation and its pastor.' The letter then stated: 'This is to advise you the action of the Lewistown congregation in declaring itself independent and upholding its pastor, the Reverend Harold Snider, was unanimous, fair, democratic, decisive, and final.' Further, 'If your Standing Committee contemplates sending a committee from Annual Conference to this church, be assured, please, that such a committee will not be permitted to enter the church buildings. Further, there will be *no* official representative from this congregation to the Annual Conference of the Church of the Brethren this year, just as there has been none in the past two years.'

"On January 20, 1948, the Official Board of the congregation notified E. W. Strauser that the position of Elder occupied by him had been declared vacant and stated further that 'Technically speaking, the office would not carry over anyhow, inasmuch as the Shaw Avenue congregation has declared itself independent from the Church of the Brethren, and your Eldership is in the latter.'

"At the May 16, 1948, meeting of the Church Council the Reverend Mr. Snider pointed out that the governing rules of the congregation contained no provision for the ordination of individuals into the minis-

try. The constitution was accordingly amended to make such provision and, on May 17, 1948, a Service of Ordination was conducted for the ordination of the Reverend Mr. Snider. The Examining Committee was made up of ministers none of whom was a minister of the Church of the Brethren and no representative of that church participated in the service. The printed program for the service contained the statement: 'Mr. Snider, who resigned his ministry of more than twenty years in the Church of the Brethren because of its apostasy and corrupt leadership, is serving his eighth year as pastor of this church.'

"From this recital of the events which occurred in the Lewistown congregation it is quite apparent that, beginning on May 4, 1942, the defendants set out to establish a new and different status for the Lewistown congregation and that they recognized that this was their purpose, the final acts being taken when the rift between the Reverend Mr. Snider and the church leadership reached the point that charges were preferred against him. Prior to the series of actions referred to the Lewistown congregation was in full union with the Church of the Brethren, sent delegates to Annual Conference, and recognized the authority of the Middle District. Mr. Snider was an ordained minister of the Church of the Brethren for twenty years and the congregation was presided over by Elder E. W. Strauser. As a result of these actions every tie between the local congregation and the general denomination of the Church of the Brethren was severed.

"It is idle to contend that the congregation had been merely a voluntary associate in the Annual Conference and the Middle District and that it was merely asserting its historic position of independent sovereignty, and that these actions on its part did not change

its status. By his letter of resignation the Reverend Mr. Snider fully recognized that there was a general Church of the Brethren whose leadership he claimed was corrupt and apostate and from which he desired to sever his connections. After resigning as a minister of that church he did not consider himself as an ordained minister of the gospel and he had to be reordained by the local congregation which had become an independent church. In their letter to E. W. Strauser informing him that his office as Elder had been declared vacant the defendants clearly showed that they considered a new status had been created since they told him that his office as Elder would not carry over anyhow inasmuch as the Shaw Avenue congregation had declared itself independent from the Church of the Brethren and his Eldership was in the latter. This is a clear recognition that there was a general denomination of the Church of the Brethren of which the Shaw Avenue congregation had been a part, but from which it had declared itself independent, and as a result of that declaration of independence his authority as an Elder of the Church of the Brethren was invalid. This view is further strengthened by the action of the Church Council on April 26th, 1948, which, in addition to adopting the name of Calvary Independent Church of the Brethren, also set forth its doctrinal belief and then stated that it would practice the 'distinctive Brethren doctrines and teachings as set forth in the statement of faith which is published *by the church entitled "The Church of the Brethren,"* insofar as they are formed in agreement with God's Word.' Here is a recognition in an official resolution of the defendant congregation that there was a church entitled 'The Church of the Brethren' but that the local congregation was no longer a part thereof but was merely adopting its statement of faith,

and then only insofar as the local congregation considered it in agreement with God's Word."

The learned chancellor then correctly stated the law, as laid down in our decisions, applicable to the facts thus found, as follows: "All of these acts had the effect of setting up a new church completely independent of the Church of the Brethren with which the congregation had previously been affiliated. The legal question presented is whether this was such a departure or deviation from the laws, usages and customs accepted by the body before the dispute arose. (Nagle vs. Miller, 275 Pa. 157), or from the faith, doctrine and practices (Kicinko vs. Petruska, 259 Pa. 1) as to require equitable action to preserve the property of the congregation to the uses to which it had been dedicated.

"In First Baptist Church vs. Allison, 304 Pa. 1 (1931), the syllabus reads: 'So far as concerns the property of a church, whether of the congregation or federated type, the use thereof is limited and controlled by the language of the deed, and no majority, however great, can divert the property to a use substantially different from that specified in the deed. In the case of an incorporated church, whether of the congregational or federated type, its property cannot be diverted to a use substantially different from that expressed in the charter.' The Lewistown church was incorporated in 1917 and the charter provided: 'The purpose of said corporation is the support of the public worship of Almighty God, according to the faith, doctrine, discipline (sic) and usages commonly accepted by the Church of the Brethren of the United States of America.' The deed to the one property in question was to certain persons as 'Trustees of the German Baptist Brethren Church of the Lewistown Congregation,' and the deed to the other property was to: 'the Church of

the Brethren, Lewistown, Mifflin County, Penna.' The Act of April 26, 1855, P. L. 328, Section 7, as last amended by the Act of June 20, 1935, P. L. 353, Section 1 (10 P. S. 81), provides that when any property is conveyed to any ecclesiastical corporation for, or in trust for, religious worship, it shall be taken and held subject to the control and disposition of such persons or authorities of such church having a controlling power according to the rules, regulations, usages, or corporate requirements of such church, which control and disposition 'shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church congregation or religious society shall belong, 'but nothing therein contained shall authorize the diversion of any property 'from the purposes, uses and trusts to which it may have been heretofore lawfully dedicated.'

"The whole case of the defendants is predicated upon the proposition that the Church of the Brethren is of the congregational type as distinguished from the federated type and that therefore the local congregation owes no allegiance to the Annual or District Conferences of the Church of the Brethren and so long as there is no radical or substantial departure from the accepted and fundamental doctrines, beliefs, and forms of worship amounting to a diversion of property to the preaching and teaching of contrary doctrines, equity may not interfere. This proposition cannot be sustained for at least two reasons. First, the Church of the Brethren is not strictly a congregational church in the sense that each congregation is sovereignly independent in all matters. This thought is well summarized in the Pastor's Manual (1925) at page 32. 'Speaking after the analogy of civil life, the

government is a combination of pure democracy and representative democracy. In the local church it is the former. In the District and General Conferences it is the latter. . . . *The highest human authority in our system of government is the General Conference,* since its action represents the combined will of all the churches. The character and policy of the local churches determine the character and policy of the General Conference. The local church and the General Conference are mutually conditioning factors, acting and reacting upon each other, the two influences combining to determine the character and trend of the church life.' It may well be that in its beginning the Church of the Brethren was a strictly congregational type church and that the Annual Conference was created for exchange of ideas and mutual assistance. The Annual Conference is, however, an essential part of the Church of the Brethren and, historically, has existed at least since 1742. The District Conference of the Middle District of Pennsylvania has existed since 1862. By a gradual process of evolution the authority and discipline of the Annual and District Conference has been enlarged and extended. The defendants themselves recognized this as the Reverend Mr. Snider resigned his ministry to the Ministerial Board of the Middle District of Pennsylvania, and in their reply brief, page 22, the defendants say with reference to this dispute: 'The whole matter has been before the *highest authority of the church,* probably presented by Charles Cherry himself, and the *highest authority* did not make any claims of this kind and has not issued any statements upon which the plaintiffs could base their claims.'

"Secondly, even if it be conceded that the Church of the Brethren is of a strictly congregational type, we think the contention that equity may interfere only

if the departure amounts to the preaching and teaching of contrary doctrines is too narrow. The defendants concede on page 3 of their brief that the words contained in the charter of the corporation, supplemented by the Act of April 26, 1855, and its amendments, create the trust under which the property is held by the congregation and, 'it is to be used in accordance with and subject to the rules and regulations, usages, canons and discipline of the religious body, denomination or organization to which it belongs, namely the Church of the Brethren.' A part of that 'usage and discipline' is the connection of the local church with the Annual Conference by which they become 'mutually conditioning factors acting and reacting upon each other, the two influences combining to determine the character and trend of the church life.' Here the local congregation declared itself independent of the Annual Conference so that the 'conditioning factor', previously as a part of its usage and discipline, is eliminated. In place thereof the defendants state that they will recognize *no authority* outside the local congregation and that they would practice the distinctive Brethren doctrines and teachings of the Church of the Brethren only insofar as they are formed in agreement with God's Word, thereby reserving to themselves the right to reject those doctrines and teachings which were not in agreement with their interpretation of God's Word. This is essentially different from the purpose of the corporation as set forth in the 1917 charter where the discipline and usages of the Church of the Brethren of the United States of America was distinctly recognized and accepted. This would be as great a departure from the usages and discipline of the denomination as would be a teaching of contrary religious doctrine, and would be a violation of the trusts under which the property

was held. True, the defendants have not joined any other denomination as was done in the Myersdale case, but they have accomplished the same thing by setting themselves up as a church separate and apart from the general denomination of the Church of the Brethren. Being independent they would be free to join with any other denomination of their choice or to serve as a nucleus for a new and rival denomination.

"The defendants contend that practically all of the facts complained of were the acts of the Reverend Mr. Snider as an individual and were not the acts of the congregation and therefore should not be considered as binding upon the congregation. In other words, it is their contention that the departures must be by the defendant corporation as distinguished from an individual. There is no dispute about the rule as applied to one other than the pastor, but in this instance the congregation made the acts of the Reverend Mr. Snider the acts of the congregation and it was by congregational action that the steps necessary to effect the declaration of independence were taken. In the letter to the Moderator of General Conference dated June 11, 1948, they stated that the action of the congregation in declaring itself independent and upholding the pastor, the Reverend Harold Snider, was unanimous, etc.: See Kicinko vs. Petruska, 259 Pa. 1 (1917).

"Likewise, the contention that the name 'Calvary Independent Church of the Brethren' was adopted merely as a colloquial name is rejected. The change in name was contained in the same resolution which declared the independence of the church from any authority outside the local congregation. True, the congregation did not amend its charter to effect a change of name but it is clear that they considered the charter merely as a legal formality and that they were bound by their constitution aside from the charter.

This was the purpose of the amendment requiring unanimous action to set aside the constitution.

"The plaintiffs brought this action in the names of the corporation, the trustees elected at a meeting held in the Burnham Church, and in the name of the trustees as individuals and members of the congregation. The defendants contend there was no authority to bring the action in the name of the corporation and that the election of the trustees was invalid since there was no vacancy in the office at that time. The action was brought against the defendants individually and as members of the congregation or group known and designated as the Calvary Independent Church of the Brethren. Throughout the case the matter was considered as though there were two separate and distinct congregations. As we view the situation there never were two congregations; there were merely two factions of the same congregation. The defendant's group or faction attempted to take the congregation out of the Church of the Brethren while the plaintiffs' group or faction is attempting to retain the former status of the congregation. In Winebrenner vs. Colder, 43 Pa. 244 (1862), the Court said: 'According to the legal and equitable principles of such association, it is those who adhere or submit to the regular order of the church, local and general (even though they be a minority) that constitute the true congregation, and was the true corporation if it be incorporated.' Having found that the plaintiffs are those who adhere or submit to the regular order of the church, local and general it is they who constitute the true congregation and the true corporation. As in Schnorr's Appeal, 67 Pa. 138, 148 (1870): 'It does not lie in the mouth of the defendants to object in any way in this proceeding to the regularity of the election of the plaintiffs. The defendants are strangers. They made themselves so

by their solemn act, throwing off their connection with the . . . church.' We attach no significance to the fact that some of the plaintiffs were present at some of the meetings at which the various acts took place and may even have voted in favor thereof. This would not prevent them from seeking to have enforced the trust under which the property was held, particularly in view of the fact that the question of whether the actions of the defendants would take the congregation out of the Church of the Brethren was frequently discussed and the plaintiffs were assured that would not result.

"The defendants contend that the present situation is the result of ill feeling between the local minister and the Elders of the Middle District, and that the present dispute was brought about by the Elders attempting to interfere in the affairs of the local congregation. There is no evidence that the Elders of the Middle District did any act which was not within their proper function just as there is no evidence that the leaders of the church were false, corrupt or apostate. Whatever the merits of that controversy may be, the local minister, merely because he is not in agreement with the leadership of the church, cannot lead the local congregation from the denomination to which it belongs and set it up as an independent church taking with it the property dedicated to the worship of Almighty God according to the faith, doctrine, discipline and usages commonly accepted by the general denomination.

"There can be no doubt of the right of a local minister or a local congregation to disagree with the leadership of the denomination. Where such disagreement occurs two courses are open to them. They may seek to change the leadership of the denomination through the regular church channels or they may withdraw

from the denomination. Their rights in the latter choice are well stated in Schnorr's Appeal, 67 Pa. 138, 147 (1870) : 'The guarantee of religious freedom has nothing to do with the property. . . . It secures to individuals the right of withdrawing, forming a new society, with such creed and government as they please, raising from their own means another fund and building another house of worship; but it does not confer upon them the right of taking property consecrated to other uses by those who may now be sleeping in their graves.' At page 146 it is stated : 'When the founders or donors have clearly expressed their intention that a particular set of doctrines shall be taught, or a particular form of worship and government maintained, it is not in the power of individuals having the management of the institution at any time to alter the purpose for which it was founded. When a church has been organized, and been endowed, whether by donation or subscription, as belonging to any particular sect or in subordination to any particular form of church government it cannot break off from that connection and government.' In the present case the church was organized as belonging to the Church of the Brethren of the United States of America and even though the minister and a majority of the congregation may disagree with the leadership of that denomination they cannot break off from the connection and the church government taking with them the property consecrated to the worship of God according to the faith, doctrine, discipline and usages commonly accepted by that denomination.

"The defendants make a point of the fact that the Reverend Mr. Snider resigned only his ministry in the Church of the Brethren and that he and the other members of the congregation are in regular standing in that denomination and that no action was taken by

General Conference to disaffiliate the Lewistown congregation. Here again they recognize the authority of General Conference and the existence of a general denomination to which they claim to belong but from which they have declared their independence. It is true that no such action was taken by General Conference, and that the only action seeking to disaffiliate the local church was taken by the defendants themselves. Having taken such action, it is difficult to understand how they can claim to be members of the general denomination which they have repudiated. There cannot be a membership in the general denomination without an acceptance of the discipline and usages which such membership entails. In the Church of the Brethren that membership entails a union with the Annual Conference and the District Conference."

The learned judge also correctly ruled in accordance with our precedents that "It is not the province of the Civil Courts to determine the correctness of contrary and conflicting religious doctrines and beliefs. A Court of Equity cannot decide ecclesiastical questions unless property rights are involved and then only insofar as is necessary to adjudicate the property rights. But, where there is a division in a congregation and the title to its property comes into question, it is the duty of a Court of Equity to determine in which faction title to the property vests. Under the law of Pennsylvania it is clear that the property vests in that faction, whether majority or minority, which continues to act in harmony with the laws, usages and customs accepted by the body before the dispute and dissension arose and that faction is the true congregation and corporation, if incorporated: Schnorr's Appeal, 67 Pa. 138; Bose vs. Christ, 193 Pa. 13 (1899); Kicinko vs. Petruska, 259 Pa. 1 (1917); Chrapko vs. Kobasa, 271 Pa. 447 (1921); Nagle vs Miller, 275 Pa.

157 (1922). An independent or congregational church is governed by the majority of its own membership so long as they act within the purposes of the organization, but, if connected with a given denomination, it is bound, not only by its rules and laws, but also by the laws and usages of the particular sect or ecclesiastical organization with which it is affiliated: McGinnis vs. Watson, 41 Pa. 9 (1861); Winebrenner vs. Colder, 43 Pa. 244 (1862); Nagle vs. Miller, 275 Pa. 157 (1922)."

The learned chancellor then entered a decree nisi granting the relief prayed for declaring the plaintiffs to represent the true corporation and the true congregation of the First Church of the Brethren of Lewistown, Pennsylvania, and directed defendants to deliver to the plaintiff and its duly constituted and elected officers and representatives, possession of the church property and restraining defendants from interfering with the plaintiffs' use of said property. The defendant, Harold Snider, was restrained from preaching or conducting services in the church or occupying the parsonage without permission from the plaintiff corporation.

To the findings and decree the defendants filed 98 exceptions which were carefully considered by Judge SHEELY sitting as the court en banc and dismissed in a further opinion. With the modification that the injunction was not "to be construed as preventing individual members of the defendant faction from becoming members of the plaintiff congregation" the decree nisi was then made final. From the final decree this appeal was taken.

At the argument counsel for the defendant raised certain questions which we now proceed to dispose of. First, we consider the question of practice raised viz., whether there was error in the chancellor sitting

alone as a court en banc to hear argument on, and dispose of, the exceptions to his findings, adjudication and decree.

In this case President Judge UTTLEY, the only judge of the judicial district in which the action was brought, disqualified himself and called in President Judge SHEELY to preside specially. Of course his disqualification applied equally to sitting with the chancellor en banc on the exceptions filed. In such case we have held that where the chancellor is a specially presiding judge from another district and all the judges of the district are disqualified an outside judge should be called in to sit with him: *Carney v. Penn Oil Co.*, 289 Pa. 588, 591, 137 A. 799 (1927); *Stone v. New Schiller B. & L. Assn.*, 293 Pa. 161, 168, 142 A. 293 (1928). But the right to have the exceptions so heard may be waived and where, as here, no objection was made to the chancellor sitting alone at the argument, we will not entertain such an objection now: *Heffernan v. Heffernan*, 344 Pa. 137, 139, 23 A. 2d 424 (1942); *O'Hara v. Scranton*, 342 Pa. 137, 141, 19 A. 2d 114 (1941). Counsel frankly admits this exception to the general rule but argues that because the chancellor did sit alone we ought not to apply the well settled principle concerning the weight to be given findings approved by the court en banc. We do not agree. Having elected to argue his exceptions before the court en banc as constituted, he cannot reasonably ask us to disregard the principle and have us set aside the findings thus approved. Especially is this so where as here the dismissal of the exceptions were not perfunctory, but carefully considered and the evidence reviewed, as clearly appears from the opinion sur exceptions.

Turning now to the merits of the appeal we find appellants' learned counsel argues that the assertion

of independence of control outside of the congregation cannot cause a forfeiture of its property where the denomination has no rule, regulation or by-law or the like prohibiting such an assertion of independence. This may be conceded as a general proposition but the chancellor found the facts otherwise. Nor is the word forfeiture well chosen because the question is not one of forfeiture but of the right of the defendants to divert the church property from the purposes for which it was acquired and to which it was dedicated.

In this connection the origin of the church becomes important as we recently held in *Kraftician v. St. Peter and St. Paul's Russian Greek Catholic Congregation of Carnegie*, 366 Pa. 431. On this question, which is purely one of fact, the learned court below found that the church was founded by a group, part of an unincorporated association known as the Dry Valley Congregation of the Brethren which was active in the communities of Lewistown, Burnham, Maitland, Bannerville and Spring Run. That the Dry Valley Congregation continued as an unincorporated association until 1917 when in accordance with action taken at a meeting on March 25, 1917, the congregation divided and separate charters were granted to the Dry Valley Congregation of the Church of the Brethren and to the appellee. That the real estate in which the church was erected was acquired in 1895 by deed of conveyance to named Trustees of the German Baptist[1] Brethren

---

[1] The denomination now known as Church of the Brethren has been variously known as German Baptist, Tunkers or Dunkers because of their belief in baptism by triple (trine) immersion. The words Tunker or Dunker are German for dipping, i.e., immersion. Official documents show that the name "German Baptist Brethren Church" was the name most often used until the Annual Conference of 1908 adopted the name Church of the Brethren which then became the official name and remained as such.

Church of the Lewistown Congregation or their successors in office. That this congregation later incorporated under the name of First Church of the Brethren of Lewistown by a charter which declared "The purpose of said corporation is the support of the public worship of Almighty God, *according to the faith, doctrine discipline and usages, commonly accepted by the Church of the Brethren of the United States of America.*" (emphasis supplied) That the lot on which the parsonage was erected was after incorporation acquired by the corporation, being named in the deed the Church of the Brethren Lewistown, Mifflin County, Penna. That the corporation and its predecessors have been affiliated with the General Conference of the Brethren and, since their creation, with the Eastern Region and the Middle District. All its ministers were duly ordained ministers of the Church of the Brethren of the United States of America.

In view of this brief resume of the facts found on adequate evidence it is vain for the appellants' counsel to argue that there was no attempted diversion of the church property by the defendants or that the decree operated to deprive the defendant group of the church property. As President Judge SHEELY in his opinion for the court en banc well said, "The property has at all times belonged to the First Church of the Brethren of Lewistown and still belongs to that congregation and corporation, subject to the trust that it shall be used for the purpose of worship according to the faith, doctrine, discipline and usages commonly accepted by the Church of the Brethren of the United States of America. The defendants, led by Reverend Harold Snider, were the ones who attempted to take the church out of the denomination and to set it up as an independent church, thereby using the church

property for a purpose foreign to the trust." In view of the findings we see no error in this regard.

Finally counsel argues that even accepting the fact findings, the inferences drawn therefrom by the court below are incorrect and that at the most the acts complained of were but "deviations" and not "departures" from the original concept of the church. Whether there is any real distinction between the words "deviation" and "departures" may well be doubted, for the record shows that during the trial both counsel and witnesses used both words indiscriminately and as though they were synonymous. While some dictionaries define "departure" as a separation and "deviation" as a wandering or turning aside from the true path, it is obvious the distinction is only one of degree and there is other dictionary authority including the Oxford Dictionary, for the use of both words as synonyms.

Counsel for the appellant learnedly discusses each of the acts complained of by the plaintiffs and endeavors to show each to be but a minor "deviation" and not a "departure" from the faith. It may be true that taken singly each instance may have been relatively of small importance but when they finally culminated in a rupture as evidenced by the disavowal of the before accepted "faith, doctrines, discipline and usages" as well as by a denial of the authority of the General Conference, followed by a declaration of complete independence, such actions call them what you will, became the reason for the separation or departure from the denomination to which the church owed allegiance. Thus it is vain for counsel to argue that each incident was but a minor deviation immaterial and unimportant, that we need not stop to argue for the fact is that together they became eventually important enough to lead the defendant group to declare its independence.

Counsel urges strongly to us as he did to the court below the case of *Cadman Memorial Congregational Society of Brooklyn vs. Kenyon,* 197 N. Y. Misc. 124, for the proposition that churches of the type founded as independent congregations are not bound by the authority of a general council established to aid and advise churches with which it may have affiliated. It may be conceded that where a church is founded as an independent congregational type it is not subject to any control but that of its own congregation and we have so held in *Kraftician v. St. Peter & St. Paul's Russian Greek Catholic Church,* 366 Pa. 431. In the New York case it was conceded that the church was founded as an independent congregation and in the *Kraftician* case such independence of denominational authority was found as a fact, whereas in this case the court below found to the contrary and that this church was of the federated type of church whose recognized authority was the general conference.

The appeal must be dismissed and decree affirmed at the cost of appellants.