## Kaminski, Appellant, *v.* Hoynak.

Argued January 5, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Walter T. Darmopray*, with him *Truman D. Wade* and *Wade, Wade & Wade*, for appellants.

*Thomas C. Gawthrop*, with him *Gawthrop & Gawthrop, W. Edward Bushong, Jr.*, and *W. Edward Greenwood*, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, March 23, 1953:

This is an appeal from a final decree in equity which granted affirmative relief to the appellee, defendant in the court below.

Plaintiffs as officers of the Holy Ghost Carpatho-Russian Greek Catholic Orthodox Church of the Eastern Rite of Phoenixville filed a bill in equity against the defendant seeking to enjoin him, as pastor, from conducting services in the church and to compel him to surrender his living quarters in the church property. The defendant filed an answer and after denying the allegations of the bill, set forth new matter and prayed that plaintiffs be enjoined from interfering with the performance of his duties as pastor of the church and the occupation of his quarters and access to his personal property located therein. Plaintiffs then filed a reply to the new matter alleged in the answer.

At the trial plaintiffs' counsel stated that plaintiffs already had the relief sought and that no testimony would be offered in support of the bill. Evidence was then presented by defendant in support of his new matter and by plaintiffs in support of their reply.

The issue presented by the pleadings was whether or not the defendant had been removed from his position as pastor of the Phoenixville Church in accordance with the Constitution and Laws of The American Carpatho-Russian Orthodox Greek Catholic Diocese, United States of America, to which the Phoenixville Church was subject.

The facts are as follows: Defendant was appointed pastor of the Phoenixville Church in 1937. The Constitution and Laws of The American Carpatho-Russian Orthodox Greek Catholic Diocese require that each parish provide for its pastor suitable living quarters, utilities and a salary of not less than $150 per month.

These were provided for defendant by the Phoenixville Church. Sometime prior to April, 1951, the Bishop of the Diocese, the Right Reverend Orestes P. Chornock, received the following petition, to which were attached 123 names: "To whom it may concern: The undersigned, members of the Holy Ghost Church of Phoenixville, Pennsylvania, wish the immediate removal of our present pastor, the Reverend Michael Hoynak from his post as pastor of our church, and be replaced by a pastor who will be selected by the congregation and with the approval of our Bishop, the Right Reverend Orestes P. Chornock; . . .". Upon receipt of the petition, the Bishop instructed Dean Joseph Milly and Father Elias Kozar to investigate the matter. After defendant had orally refused to resign, he received a letter from Dean Milly dated April 4, 1951 which stated that the Bishop had requested the Dean to go to Phoenixville ". . . to hear evidence from both sides and to send him the minutes of the meeting.", and that the Dean would be in Phoenixville at 5 P.M. on Sunday, April 15th, to conduct the meeting. Defendant read this letter to the congregation at services on two Sundays. On April 15, 1951 at 5 P.M., defendant, along with a large number of the members of his congregation, assembled at the meeting. The Dean was not then present. After waiting until 6:15 P.M., defendant left the meeting and went to his living quarters. A few minutes later the Dean and Father Kozar arrived. After being informed of their arrival, defendant refused to attend the meeting. The Dean nevertheless proceeded to hold the meeting and upon testimony of approximately 20 members of the parish, he and Father Kozar recommended that defendant be replaced as pastor of the Phoenixville Church. Upon receipt of this recommendation, the Bishop called a meeting of his consistory (seven clergymen who are members of the Board of Trustees) and

with their consent sent to defendant the following letter, which was dated May 1, 1951: "Reverend Father: On the basis of an inquiry held April 15th, 1951 at Phoenixville, Pa., I herewith request that Your Reverence resign, for the welfare of the parish and diocese, as pastor of Holy Ghost Church, Phoenixville, Pa., as of May 15th, 1951. In the event of disobedience in this regard, jurisdiction 'ipso facto' (over said parish) shall be taken away from you, and the parishioners of said parish shall be forced to take legal action.". Defendant refused to accept this letter and did not see it until it was shown to him by his counsel on May 29, 1951. Since May 27, 1951, plaintiffs have prevented defendant from conducting any church services. Since May 29, 1951, plaintiffs have prevented defendant from occupying or having access to the pastor's living quarters and some of his personal property contained therein.

After a hearing, the chancellor entered a decree dismissing the bill and granting the prayer for affirmative relief in the answer. This decree was made final and plaintiffs have appealed.

Appellants make several contentions, but they can be reduced to the following: (1) Civil courts do not have jurisdiction over ecclesiastical matters, and (2) the court erred in rejecting testimony offered to explain the laws of the church.

Appellants' first contention is correct as it is stated. It is true that civil courts do not have jurisdiction to entertain purely ecclesiastical matters such as those concerning church government, doctrine or discipline. *Krecker et al. v. Shirey et al., and Immanuel's Church of the Evangelical Association of Reading*, 163 Pa. 534, 30 A. 440. However, a court of equity does have jurisdiction to protect property rights and where such rights are involved, the fact that the dispute arose within a

church organization will not prevent a court of equity from acting to protect those property rights: *First Church of the Brethren of Lewistown v. Snider*, 367 Pa. 78, 79 A. 2d 422. And the jurisdiction of equity having properly attached because of the existence of property rights, it will dispose of the entire controversy: *Bowman v. Gum, Incorporated et al.*, 327 Pa. 403, 412, 193 A. 271, and cases cited therein. It may not be amiss to note that appellants, plaintiffs in the court below, initiated this action by filing their bill. They are now in the anomalous position of attacking the jurisdiction of the same court whose jurisdiction they themselves invoked.

This case concerns, inter alia, the right of the pastor of the Phoenixville Church to living quarters, services, and salary. If he has been deprived of them contrary to the provisions of the Constitution and Laws adopted by The American Carpatho-Russian Orthodox Greek Catholic Diocese, equity will provide a remedy. If the action of a church body is contrary to the law it professes to administer, such action may be reviewed: *Krecker et al. v. Shirey et al.*, supra, at p. 551. In order to determine whether or not the actions taken by plaintiffs and the Bishop in purporting to remove defendant from the position of pastor of the Phoenixville Church were in accordance with the procedure established for such removal, it is necessary to examine the Constitution and Laws of the Diocese.

The relevant provisions of the Constitution and Laws are as follows: ". . . 74.(a) The priest who has been appointed canonically as a Pastor of a Parish, unless his appointment was expressly made pro tempore, shall remain in office permanently, but he can be removed by the Bishop for any reason which makes his parochial ministry inefficient or harmful to the spiritual welfare of the Parish, even though the Pastor

is not personally guilty of any crime or negligence. (b) After the Bishop and at least two members of His Consistory have carefully examined the gravity of the reasons for the removal of the Pastor or the truth of the charges brought against him, and find that they justify the removal of the Pastor, the Bishop shall exhort the Pastor in a registered return-receipted letter to resign from his pastorship within a specified time to be fixed by the Bishop. (c) The Bishop's letter must set forth the reasons why the Bishop has decided to remove the Pastor, otherwise the Bishop's request for the resignation of the Pastor shall be invalid. (d) If the Pastor shall not have resigned within the time allotted to him, nor shall have asked for a justifiable delay, nor shall have contested the charge or charges brought against him, and otherwise has no excuse acceptable to the Bishop for delaying his answer, the Bishop shall declare his pastorship to be terminated and the Parish to be vacant. (e) If the priest wishes to extend the time of his resignation or refused to resign he must present his reasons in writing to the Bishop, who with at least three members of His Consistory, must consider, discuss, approve or reject them. (f) If the Bishop and at least three members of his Consistory, after having duly considered the reasons set forth by the Pastor, decide to reject them the Bishop shall again admonish the Pastor to resign and threaten to remove him if he does not resign voluntarily within a specified time to be fixed by the Bishop. The specified time having elapsed, the Bishop shall issue the decree of removal and the Parish shall be considered as vacant without any further procedure. . . . (i) The Bishop cannot remove a Pastor who performs his parochial ministry satisfactorily and against whom there are no canonical reasons to justify his removal. The Bishop, however, may try to persuade such a Pastor

to consent to a transfer to another Parish for the love of God and the welfare of souls. (j) Charges of any offenses, accusations against any priest of the Diocese may be made by three or more male members in good standing of any Parish of the Diocese. Such charges must be made in the nature of a written representation and addressed to the Bishop, and must be signed by all the accusers and sworn to by at least one of them in the presence of the Dean of the district to which the accused priest belongs. The Bishop shall not take any action upon receipt of such written representation before informing the accused priest of the nature of the charges brought against him. No complaints, accusations, charges of offenses against any priest shall be taken into consideration unless the above outlined procedure has been strictly complied to. (k) In other cases not based on grave reasons but because of the general dissatisfaction of the parish with its priest, the priest can only be removed by $3/4$ vote of members of the parish at regular special meeting of the parish at which there must be at least $3/4$ of all legal members of the parish present. . .".

From a careful reading of this section it is apparent that there are two methods of initiating action for the removal of a pastor. The Bishop may act upon his own motion or his action may be the result of charges made by members of the parish. In the instant case the Bishop testified that he acted solely upon the petition and charges of the parishioners. Section 74(j) supra, provides that such charges must be addressed to the Bishop in writing, by at least three male members of the parish who are in good standing, and sworn to by at least one of them in the presence of the Dean. Admittedly this procedure was not followed. The petition of the parishioners was not addressed to the Bishop, it contained no charges, and no affidavit was

included. Therefore it was not in accordance with the requirements of Section 74(j) and was of no effect. Section 74(j) itself provides: ". . . No Complaints, accusations, charges of offenses against any priest shall be taken into consideration unless the above outlined procedure has been strictly complied to.". Nevertheless, the Bishop took action to remove defendant from his position as pastor. Assuming arguendo, that in spite of the provisions of Section 74(j) the Bishop had power to act on his own motion, his attempted removal of defendant was ineffective. Under the provisions of Section 74(c), supra, a request from the Bishop for the resignation of a pastor is invalid unless it sets forth reasons for the removal. The phrase "for the welfare of the parish and diocese" which appeared in the Bishop's letter to defendant was a statement of a conclusion, and the reasons which support that conclusion did not appear. The attempted removal of defendant from his position as pastor of the Phoenixville Church was not in accordance with the procedure established by the Constitution and Laws of The American Carpatho-Russian Orthodox Greek Catholic Diocese, and was therefore a nullity.

Appellants further contend that since a right to appeal is afforded by Section 74, defendant must appeal to the church tribunal and not to the civil courts. The right to appeal is not specifically spelled out in Section 74, but it is clear that some procedure is available to a priest who wishes to contest his removal. Whether this procedure amounts to an appeal or not, it was not necessary for the defendant to avail himself of the remedy provided in Section 74, since the attempted removal of the priest was a nullity for failure to follow the mandatory procedure required by the same section for removal.

Appellants cite many authorities, but rely principally upon *Furmanski et al. v. Iwanowski et al.,* 265 Pa. 1, 108 A. 27, for the proposition that the proceedings of a church tribunal are binding upon the members of the church. This rule is applied where the ecclesiastical tribunal is acting on a matter within its jurisdiction and in accordance with the procedure prescribed for that tribunal by the governing law of the particular church, but does not apply where the proper procedure is not followed.

In a supplemental brief appellants cite Section 148 of the Constitution and Laws as authority for the removal of appellee. This section was not cited or relied upon in appellants' original brief or in the court below. Section 148 provides that the parish by majority vote has the right to demand church inquisition of a pastor by the Diocesan Tribunal. This is merely an additional manner of initiating action against a pastor within the church, but does not abrogate the mandatory requirement of Section 74(c), supra, which was not followed in this case. It does not affect the result previously indicated.

There is no merit in appellants' contention that the chancellor erred in refusing to admit testimony of Bishop Chornock as to the meaning of the laws of the denomination. The best evidence of the laws of the denomination was the Constitution and Laws of The American Carpatho-Russian Orthodox Greek Catholic Diocese, which had been already admitted into evidence. Moreover, examination of the record shows that the questions asked of the Bishop were not in reference to the meaning of the laws of the church, but as to whether or not defendant was a pastor or priest at the time of the trial. This was the issue of the case, and any answers by the Bishop would be merely an

opinion or conclusion on the issue presented by the pleadings. Such testimony was clearly inadmissible.

We have considered all of the contentions made and authorities cited by appellants, but deem further discussion unnecessary.

While the decree of the court below purported to dismiss the bill, it is clear that all that could have have been intended was a denial of the relief sought by the plaintiffs and a retention of the bill in order that the defendant could be granted the relief for which his answer prayed and to which he is entitled. The decree is therefore modified accordingly.

As modified, the decree of the court below is affirmed, costs to be paid by the appellants.