## Bryant v. Edwards

*Ronald M. McCaskill*, for plaintiffs.
*S. Allen Needleman*, for defendants.

BIUNNO, *J.*, June 17, 1980—This is an equity action in which the principal issue is the legality of the procedure employed by a Baptist church in terminating the employment of its pastor.

Plaintiffs are the Reverend Thomas F. Bryant, the pastor of the New Welcome Baptist Church, and John Doe and Mary Roe, unnamed individuals and representatives of a class of unnamed individuals who are members of the church. Defendants are all of the individual members of the Board of Deacons of the New Welcome Baptist Church and Mary Coe and Richard Sloe, unnamed individuals and representatives of a class of individuals who are members of the church.

## FINDINGS OF FACT

The New Welcome Baptist Church is located at Twentieth and Parrish Streets in Philadelphia, Pa., and has a congregation of approximately 90 to 100

476

persons. The church has never had a written constitution or bylaws and it relies for its governance on the King James version of the New Testament and the texts of Edward T. Hiscox, D.D.[1]

The oral testimony and the cited Hiscox texts established that the New Welcome Baptist Church is controlled by no hierarchy whatsoever. "Baptists assert that each particular local church is self-governing, and independent of all other churches, and of all persons and bodies of men whatever, as to the administration of its own affairs; that it is of right, and should, be free from any other human authority, whether civil or ecclesiastical, and that this is the New Testament idea of church government."[2]

In the spring of 1973, the church engaged plaintiff, Reverend Thomas F. Bryant, an ordained minister, as its pastor. The agreement entered into between plaintiff and the church was an oral one. Duration of the pastor's employment would depend on the mutual consent or satisfaction of the parties, both plaintiff and the congregation. This finding rests on the credible testimony of Willie O. Perry, a deacon of the church, and on The New Directory.[3]

---

1. Dr. Hiscox's principal work, as testified to at trial, is The New Directory for Baptist Churches, Philadelphia, Judson Press, 1894 edition, reprinted 1958. There are abbreviated versions of the original work such as The Hiscox Guide for Baptist Churches, Philadelphia, Judson Press, 1964, which are also used for the same purposes as the original text.

2. The New Directory, p. 17.

3. Ibid., p. 108, "Note 5.—The connection between pastor and people is sometimes made for a specified and limited time. But more generally—now almost universally—for an indefinite time, to be dissolved at the option of either party, by giving *three months' notice,* or otherwise, by mutual agreement . . ."

On Sunday, April 20, 1980, a time when the pastor was known to be out of the state, Deacon Willie O. Perry announced to the congregation that church members could voice whatever complaints they had concerning the pastor at the church's regularly scheduled business meeting on April 24, 1980. It was known by the Board of Deacons that the Reverend Bryant would continue to be out of the state when the business meeting would take place.

The business meeting took place on April 24, 1980. Members of the congregation expressed dissatisfaction with the pastor and the congregation then voted to send a delegation to Reverend Bryant to ask him for his resignation. This delegation was to consist of all of the members of the Board of Deacons and all of the members of the Board of Trustees. Deacon Willie O. Perry then asked Reverend Bryant to meet with him at the church on April 30, 1980. Deacon Perry did not disclose the purpose of the meeting. However, Reverend Bryant had apparently learned the purpose of the requested meeting. The delegation went to the church on April 30, 1980, to ask the pastor for his resignation. He was not there but he left a letter for them from his lawyer. That letter stated that the pastor would attend no church meetings unless they were duly called and presided over. The letter also referred the committee to the New Testament verses in Matthew 18: 15–17, and requested that if there were any charges against Reverend Bryant they be put in writing and sent to counsel.

Reverend Bryant was never advised of any charges against him. However, on May 7, 1980, a letter was sent to him by counsel for defendants which notified the pastor that at the regularly scheduled meeting of the congregation to take place on May 22, 1980, a motion would be made to

terminate the pastor's services and that the motion would be put to a vote. The letter further notified the pastor that, ". . . only members of the congregation in good standing as of the last business meeting of April 24, 1980, will be permitted to vote on the motion to terminate your services."

Thereafter, at the Sunday services on May 11 and May 18, 1980, it was announced to the congregation that a vote on the question of terminating the Reverend Bryant's services would take place on May 22, 1980, at the regular business meeting. On either May 11 or May 18, it was also announced that only those members who were paid-up in their dues for three months immediately preceding April 24, 1980, would be eligible to vote. In this regard, it is noted that at the regular business meeting held in January, 1980, the dues were increased to $3.10 per week for each member, but the increased assessment was never, in fact, enforced. Both before and after January, 1980, it was the custom in the church to accept as sufficient weekly payment the amount of dues that a member deemed he or she could afford. Moreover, while the "good standing" of a member involved the payment of dues, it was not the sole criterion. In effect, nonpayment of dues assumed overwhelming weight when no payment whatsoever was made for a long period indicating a total lack of concern and participation in the affairs of the church.

At some time after the controversy arose, Deacon Willie O. Perry, who served as clerk for the Board of Deacons, instructed his assistant, Elsie Dolores Pearce, who kept the membership rolls of the church, not to include on the membership rolls any member who had joined the church after April 24, 1980.

On May 22, 1980, at the regularly scheduled business meeting of the New Welcome Baptist Church, several motions were placed before the members for a vote. On the first three issues a voice vote was used. These motions determined that: (1) only members of the church who were paid-up in their dues for the three months immediately preceding April 24, 1980, would be considered in good standing and eligible to vote, (2) that members of the congregation under 18 years of age would not be eligible to vote, and (3) if a dispute arose, the church was authorized to hire counsel. It is noted that the only members of the church present who were under the age of 18 were Reverend Bryant's two children.

Before the issue of terminating Reverend Bryant's services could be put to a vote, words were exchanged between Reverend Bryant and a member of the congregation and to some it appeared that a fight might break out. Some of the members of the congregation who supported Reverend Bryant convinced him that he should leave the meeting immediately for his own protection. The pastor then left the meeting with from four to ten of his supporters.

Another church member who left the meeting before the central vote was Gussie M. Thomas. She had heard the voice vote carry the motion that only those members who were paid-up in dues through April 24, 1980, would be allowed to vote on the pastor's retention. She was also aware that the dues assessed were $3.10 per week. She had only been paying $1.10 per week, which was the most she could afford, but voluntarily left the meeting under the impression that she would not be allowed to vote.

After the pastor and his supporters had left the meeting, Elsie Dolores Pearce, who maintained the rolls, reviewed the payment record of each member present and made her own individual ad hoc decisions as to which members were in good standing and eligible to vote on the retention issue. She used no fixed criterion. Except for one person, who had paid no dues whatsoever since early in 1979, she permitted everyone to vote regardless of what amount, if any, the particular person had paid during the three month period prior to April 24, 1980.

The vote was by secret paper ballots. The ballots were then counted, each vote being unfolded before the congregation and then announced and tallied. The vote was 40 to four in favor of terminating the pastor's services.

## DISCUSSION

Plaintiffs contend that the vote was improper because, they allege, custom and usage among Baptists require that a pastor's services not be terminated unless a council of ministers first be convened to attempt to reconcile any differences between a pastor and his congregation. They contend further that the manner of conducting the election violated their due process rights.

Defendants, on the other hand, contend that the dismissal of the pastor was an ecclesiastical matter over which the court has no jurisdiction and, further, that there were no improprieties in the election procedures.

### A. Jurisdiction

The First Amendment to the United States Constitution and Article 1, Section 3 of the Pennsylvania Constitution were designed to maintain a sep-

aration between Church and State. This "wall of separation" is sufficiently well established to state without citations that a court should not interfere with a church's ecclesiastical functions and internal matters.

Here, however, the court is not asked to interfere with a purely ecclesiastical or internal matter. Reverend Bryant, in effect, asserts breach of contractual right between himself and the church. He alleges breach of that contract with consequences touching on his vocation which will result in irreparable harm. Since the basis of plaintiffs' suit is violation of an asserted contractual right and the failure of the church to follow its own rules, regulations, or custom, this court has jurisdiction of the subject matter: Kaminski v. Hoynak, 373 Pa. 194, 95 A. 2d 548 (1953).

## B. Need for Convening a Council

As stated previously, the New Welcome Baptist Church has no written constitution or bylaws and no written regulations or rules touching on the matters here involved. In such circumstances, and the parties agree, the court must look to the custom and usage within the church in order to determine the rights of the parties.

Plaintiffs contend that before a Baptist church may terminate its relationship with its pastor, it must first convene a council composed of ministers of the Baptist faith. This council would then hear evidence against the pastor and make a non-binding recommendation to the congregation involved. The congregation would then be free to accept or reject the recommendations of the council.

Plaintiffs base their claim that a council is a prerequisite to the dismissal of a pastor on the Gospel

according to Saint Matthew as found in the King James version of the New Testament, and on the New Directory of Baptist Churches by Edward T. Hiscox, supra.

Matthew 18: 15–17 provides:

"Moreover if thy brother shall trespass against thee, go and tell him his fault between thee and him alone: if he shall hear thee, thou hast gained thy brother.

"But if he will not hear thee, then take with thee one or two more, that in the mouth of two or three witnesses every word may be established.

"And if he shall neglect to hear them, tell it unto the church: but, if he neglect to hear the church, let him be unto thee as an heathen man and a publican." The Holy Bible, Authorized King James Version, Collins, London, 1957.

We intend no exegesis of the scriptures, but merely set forth the passage to acquaint the reader with plaintiffs' contentions.

However, since both plaintiffs and defendants agree that the writings of Dr. Hiscox in his New Directory are dispositive, it is noted that Dr. Hiscox does recommend the convening of a council in those matters dealing with ". . . a minister who has lost public confidence, *and who,* by unchristian or unministerial conduct, is believed to be unfit to discharge the functions of, or to remain in, the sacred office."[4] (Emphasis supplied.)

It is clear from Hiscox, on whom the parties rely, that a council is a recommended and not a mandatory procedure in those cases in which the pastor is

---

4. The New Directory, op. cit., p. 206.

in effect accused of violating the precepts of the Baptist religion.[5] No such charges were leveled here.

Here the issue was simply whether or not the pastor should be retained or discharged from the particular church which we have already noted is free and independent of all other churches. According to Hiscox, a pastor's connection with a church may be terminated at will.[6]

That this is so is illustrated by the following advice which Dr. Hiscox gives in discussing the length of a pastorate:

"Quite as unfortunate in its effects, and more frequently than long and fruitless pastorates, is the sudden and hasty change so often made by many, and some on the most trivial occasions . . . Let a pastor possess his soul in patience, and not be made unhappy by every little cross-current in his affairs, but if any considerable number of his kind, prudent and judicious brethren think a change is desireable . . . let him act accordingly."[7]

Under all of the evidence, plaintiffs have failed to establish that a council must be convened before the congregation may vote to terminate the relationship between a pastor and the congregation.

### C. Alleged Lack of Due Process

Finally, plaintiffs contend that their due process rights were violated by the manner in which the qualification of voters was determined. With this contention the court must agree.

---

5. Ibid., pp. 206-215.

6. Fn. 3, supra.

7. The New Directory, pp. 103, 104.

It is clear from the evidence presented that the qualification of voters was an issue for the congregation to decide. Therefore, when the Board of Deacons announced that only those members who were paid-up in their dues through April 24, 1980, would be permitted to vote, the board acted without authority. Moreover, the announced exclusion of non-paid members without notice and opportunity to bring their dues up-to-date and the failure of the Board of Deacons to record payment of dues after April 24, 1980, was inherently unfair.

In addition to the aforementioned reasons, it appears from the evidence that there was no established standard for determining who was and who was not in good standing and eligible to vote. Moreover, the congregation itself failed to enforce the rules it had itself adopted for determination of members in good standing. As a result, some members who were not completely current in their payments, or who had not paid the full $3.10 a week in dues, did not vote while other members of the congregation in almost the same position were permitted to vote. Furthermore, since the congregation numbered almost 100 and only approximately 60 persons appeared at the meeting of May 22, there is a serious question that those who did not appear may have failed to do so because of the uncertain rules as to voter eligibility.

For the aforementioned reasons, the vote taken on May 22, 1980, must be nullified. The court reiterates, however, that the New Welcome Baptist Church has the power to terminate the services of its pastor without need of convening a council. What it must do, however, is to conduct its voting procedures fairly according to its own rules.

## CONCLUSIONS OF LAW

1. The court has jurisdiction in this controversy.

2. The New Welcome Baptist Church need not convene a council of ministers prior to holding an election to determine whether or not the services of its pastor should be terminated.

3. Due process requires that the qualification of electors in any such election be determined fairly and non-arbitrarily prior to the holding of any such election.

4. The due process rights of plaintiffs were violated by the procedures adopted in the election of May 22, 1980.

## DECREE NISI

And now, June 17, 1980, it is hereby ordered and decreed that:

(1) The vote taken at the New Welcome Baptist Church on May 22, 1980, is declared null and void.

(2) Defendants are enjoined from disrupting any and all services at the said church or from harming plaintiff or anyone else similarly situated who desires to attend said church,

(3) Defendants are further enjoined from locking the Reverend Thomas F. Bryant out of the church building or his office therein, and from entering the pulpit of the said church.

Nothing in this order shall be construed to prevent the said church from conducting a new vote on the retention of the Reverend Thomas. F. Bryant.

If no exceptions are filed within 20 days after notice of the filing of this adjudication, this decree nisi shall be entered by the prothonotary on praecipe as the final decree.